Sealed
Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
FILED

*November 12, 2020*

David J. Bradley, Clerk of Court

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| v. | § | Criminal No. **4:20-cr-583** |
| **AMIR AQEEL,** | § | **UNDER SEAL** |
| **SIDDIQ AZEEMUDDIN,** | | |
| **RIFAT BAJWA,** | § | |
| **PARDEEP BASRA,** | | |
| **MAYER MISAK,** | § | |
| **MAURICIO NAVIA, and** | | |
| **RICHARD REUTH,** | § | |
| **Defendants.** | | |

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At various times material to this Indictment:

### *The Defendants*

1. Defendant AMIR AQEEL was a resident of Houston, Texas, within the Southern District of Texas.

2. Defendant SIDDIQ AZEEMUDDIN was a resident of Naperville, Illinois, within the Northern District of Illinois.

3. Defendant RIFAT BAJWA was a resident of Richmond, Texas, within the Southern District of Texas.

4. Defendant PARDEEP BASRA was a resident of Houston, Texas, within the Southern District of Texas.

5. Defendant MAYER MISAK was a resident of Cypress, Texas, within the Southern District of Texas.

6. Defendant MAURICIO NAVIA was a resident of Katy, Texas, within the Southern District of Texas.

7. Defendant RICHARD REUTH was a resident of Spring, Texas, within the Southern District of Texas.

### *Relevant Entities*

8. AF Logistics, LLC ("AF Logistics") was a Texas Limited Liability Company that was registered on or about February 6, 2018, to BASRA.

9. Basra, LLC ("Basra") was a Texas Limited Liability Company that was registered on or about May 13, 2014. On or about June 17, 2019, the new registered agent for the company was BASRA.

10. Champion Automower Inc. ("Champion Automower") was a Texas corporation that was registered on or about October 11, 2018. REUTH was a manager.

11. Grandeur Construction, LLC ("Grandeur Construction") was a Texas Limited Liability Company that was registered on or about April 25, 2017, to NAVIA.

12. Houston Electronic Group, LLC ("Houston Electronic") was a Texas Limited Liability Company that was registered on or about January 30, 2018.

13. Jonathan's Farms, Inc. ("Jonathan's Farms") was a Texas corporation that was registered on or about February 19, 2003.

14. Kata Services, LLC ("Kata") was a Texas Limited Liability Company that was registered on or about September 12, 2017, to AQEEL.   BAJWA was listed as a manager.

15. Log and Sod Leasing, LLC ("Log and Sod Leasing") was a Texas Limited Liability Company that was registered on or about January 3, 2005, to REUTH.

16. Sanad Inc. ("Sanad") was a Texas Corporation that was registered on or about February 18, 2005.

17. Popeshenouda, LLC ("Popeshenouda") was a Texas Limited Liability Company that was registered on or about February 7, 2019, to MISAK.

18. US Auto Exchange Inc. ("US Auto Exchange") was a Texas corporation that was registered on or about July 20, 2017.

19. Youkeva LLC ("Youkeva") was a Texas Limited Liability Company that was registered on or about February 17, 2017.

### *The Small Business Administration*

20. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses.  The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

### *The Paycheck Protection Program*

21. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 that was designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349

billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

22. In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the applicant (through its authorized representative) was required to state, among other things: (a) its average monthly payroll expenses; and (b) its number of employees. These figures were used to calculate the amount of money the small business was eligible to receive under the PPP. In addition, the applicant was required to provide documentation showing its payroll expenses.

23. A business's PPP loan application was received and processed, in the first instance, by a participating lender. If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

24. PPP loan proceeds were required to be used by the business on certain permissible expenses: payroll costs, interest on mortgages, rent, and utilities. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these expense items within a designated period of time after receiving the proceeds and used a certain amount of the PPP loan proceeds on payroll expenses.

### *Relevant Lending Institutions & Other Financial Institutions*

25. Bank 1 was a federally insured financial institution based in New York.

26. Bank 2 was a federally insured financial institution based in Florida.

27. Bank 3 was a federally insured financial institution based in Utah.

28. Bank 1, Bank 2, and Bank 3 were authorized by the SBA to participate as PPP lenders to small businesses.

29. Company 1, Company 2, and Company 3 were financial-technology companies. Company 1 and Company 2 were based in California, and Company 3 was based in Georgia. Company 1, Company 2, and Company 3 participated in the SBA's PPP by, among other things, acting as service providers between small businesses and certain lenders. Small businesses seeking a PPP loan could apply through these companies, which would review the PPP loan applications. If a PPP loan application received by one of these companies was approved for funding, a partner lender, such as Bank 3, disbursed the loan funds to the applicant.

30. Bank 4 was a federally insured financial institution based in New York.

31. Bank 5 was a credit union based in Texas.

32. Bank 6 was a federally insured financial institution based in North Carolina.

33. Bank 7 was a federally insured financial institution based in Texas.

34. Bank 8 was a Pakistani commercial bank based in Pakistan.

35. Bank 9 was a Pakistani government-owned bank based in Pakistan.

### **OVERVIEW OF THE CONSPIRACY AND THE SCHEME TO DEFRAUD**

36. Beginning in or around April 2020, and continuing until in or around October 2020, within the Southern District of Texas, and elsewhere, the defendants conspired together and with others, and with intent to defraud, devised, participated in, executed, and attempted to execute a

scheme and artifice to defraud the SBA, Bank 1, Bank 2, Bank 3, Company 1, Company 2, and Company 3, to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

37.   As part of the conspiracy, the defendants submitted, and caused to be submitted, false and fraudulent PPP loan applications in the names of certain entities to various lenders and companies. Many of these fraudulent PPP loan applications were approved and the PPP loans were subsequently funded, as further described below.

| Business Name | Lender / Company | Business Owner | Approximate Loan Amount | Funded |
|---|---|---|---|---|
| AF Logistics | Bank 1 | Person 1 | $565,082 | Yes |
| Basra | Company 1 / Bank 3 | BASRA | $67,691 | Yes |
| Champion Automower | Bank 1 | REUTH | $511,250 | Yes |
| Grandeur Construction | Company 2 | NAVIA | $455,916.65 | Yes |
| Houston Electronic | Bank 2 | Person 2 | $552,600 | Yes |
| Jonathan's Farms | Bank 2 | Person 3 | $331,600 | Yes |
| Kata | Company 2 | BAJWA | $176,332.50 | Yes |
| Log & Sod Leasing | Bank 1 | Person 4 | $564,165 | No |
| Popeshenouda | Bank 1 | MISAK | $175,000 | Yes |
| Sanad | Company 3 | Person 5 | $468,460 | Yes |

| | | | | |
|---|---|---|---|---|
| US Auto Exchange | Company 3 | Person 6 | $470,880 | Yes |
| Youkeva | Bank 1 | Person 7 | $235,830 | Yes |

**PURPOSE OF THE CONSPIRACY AND SCHEME TO DEFRAUD**

38.     It was the purpose of the conspiracy and scheme for the defendants to unjustly enrich themselves by fraudulently obtaining PPP loans under false and misleading pretenses.

**MANNER AND MEANS OF THE CONSPIRACY AND SCHEME**

39.     Beginning in or about April 2020, through at least in or around October 2020, the defendants submitted and caused the submission of over 80 PPP loan applications, including, but not limited to, those listed in Paragraph 37 (collectively, the "PPP Loan Applications"). In support of the PPP Loan Applications, the defendants submitted, and caused to be submitted, false and fraudulent documentation purporting to substantiate the monthly payroll expenses, assets, and employee count alleged in the PPP Loan Applications. This supporting documentation included false and fraudulent financial documents such as bank statements and Internal Revenue Services ("IRS") forms, in which the purported payroll expenses and the number of employees were fabricated and inflated. The defendants also falsely certified on the PPP Loan Applications that the PPP loan funds would be used to retain workers and cover payroll expenses, and to make mortgage interest payments, lease payments, and/or utility payments. In reality, however, the defendants intended to and did in fact use the PPP Loan Application funds impermissibly for their personal use and benefit.

40.     On numerous occasions during the course of and in furtherance of the conspiracy, the defendants created fraudulent documents and/or attempted to procure documents from

7

government agencies to make the businesses applying for a PPP loan appear to be active and legitimate when, in fact, the businesses were dormant. On some occasions, the defendants communicated over text message and explicitly stated how they would create fraudulent documents or attempt to reinstate inactive entities to make the companies appear eligible for PPP loans.

      a.     On or about July 7, 2020, AQEEL and NAVIA texted regarding the creation of fraudulent tax documents (IRS Form 940, IRS Form 941, and/or IRS Form W-3) in connection with a PPP loan application on behalf of Jonathan's Farms, stating, in sum and substance:

| | |
|---|---|
| AQEEL: | Brother, we will need form 940 for Jonathan farms |
| NAVIA: | I'll get them done tomorrow morning is that ok? Or you need them tonight? |
| NAVIA: | What does the yearly have to look like? |
| AQEEL: | We already did his W3. |
| AQEEL: | Tomrrow am is fine like 8am. |
| NAVIA: | I'll get it done tonight bro. |
| NAVIA: | Sent bro to . . . email. |
| NAVIA: | All quarters 2019 and quarter 1 2020. |
| AQEEL: | I think all we needed was one 940. |
| AQEEL: | Not 941. |

A PPP loan application on behalf of Jonathan's Farms, which included fraudulent tax documents, including a fraudulent IRS Form W-3 and an IRS Form 940, was submitted to Bank 2. Bank 2 funded the loan for approximately $331,600. The PPP loan application fraudulently represented that Jonathan's Farms had 24 employees, when in fact the company had no employees on record.

b.      On or about June 15, 2020, AQEEL and BASRA texted regarding securing a PPP loan for AF Logistics.  AF Logistics was an inactive corporation in 2020 and, therefore, would have been ineligible for a PPP loan.  Nevertheless, AQEEL and BASRA sought to obtain documents from the State of Texas that would make the business appear to be active to lenders:

> AQEEL:   We need to pay franchise fee and request reinstatement ASAP
>
> AQEEL:   Let me try on line
>
> AQEEL:   Do you have webfile number for af logis?
>
> BASRA:   I have everything

Later that same day, after exchanging additional text messages, AQEEL texted a screenshot from the Texas Comptroller website showing that "Amir Aqeel" had paid a franchise tax for AF Logistics.  AQEEL and BASRA then had the following text message exchange:

> BASRA:   Excellent!
>
> AQEEL:   I already took care of it ... should let me print good standing certificate in couple days
>
> AQEEL:   Then will repeat reinstatement

A PPP loan application on behalf of AF Logistics, which included fraudulent tax documents, including fraudulent IRS Forms 941, was submitted to Bank 1.  Bank 1 funded the loan for approximately $565,082.  The PPP loan application fraudulently represented that AF Logistics had 29 employees, when in fact the company had no employees on record.

41.     In furtherance of the conspiracy, the defendants often submitted fraudulent PPP loan applications and received fraudulent PPP loan funds on behalf of companies that the defendants knew were inactive companies with no employees.  On occasion, AQEEL and the

other defendants referred to these companies as "shelf" companies and explicitly acknowledged that they were inactive companies.

    a.    On or about June 30, 2020, AQEEL and REUTH texted multiple times regarding opening a bank account for Log and Sod Leasing in order to secure a PPP loan before the PPP ended. In these conversations, AQEEL acknowledged that Log and Sod Leasing as well as other entities under REUTH's control, were not active entities with actual employees. Then, on or about July 1, 2020, AQEEL texted REUTH, "We got extensions in PPP…Let's renew all companies to different people…Yahooooooo…I meant your shelf companies."

42.    Proceeds of fraudulently obtained PPP loans were divided among the defendants. At times, the defendants communicated about loan proceeds and how proceeds from certain PPP loans would be divided.

    a.    On or about May 22, 2020, AQEEL and MISAK submitted fraudulent PPP loan applications on behalf of two entities that MISAK controlled (Popeshenouda and Youkeva). AQEEL and MISAK agreed that, for these PPP loans, AQEEL would receive 33% of the proceeds. In one discussion regarding the division of proceeds, in which MISAK threatened to report AQEEL to the police, AQEEL wrote to MISAK: "With a payroll of 0 dollar how you got approved for 400K." MISAK did not respond.

    b.    After receiving PPP loan proceeds from at least two fraudulent PPP loans, MISAK recruited additional companies that were used by the defendants to submit false PPP loan applications. On or about July 24, 2020, MISAK texted AQEEL about new companies he had recruited: "Sent you 6 different profiles…I told them already for every 100k they will get on $33K…They all agreed."

43.     At times, the defendants sought to disguise the true nature of their companies, which either had no employees or had fewer employees than what was represented on the PPP Loan Applications, by creating fraudulent payrolls following the successful receipt of fraudulently obtained PPP loans.  On multiple occasions, the defendants sent text messages regarding lists of fake employees, many of whom were friends or relatives of the defendants.

    a.     On or about July 9, 2020, AQEEL and NAVIA exchanged text messages regarding payroll:

| | | |
|---|---|---|
| AQEEL: | We are gonna run it 75k for each company |
| AQEEL: | Every two weeks, to be on safe side |
| NAVIA: | Ok so lemme call [IM] to make sure the numbers will meet that quota |
| NAVIA: | No check over 4000 |
| AQEEL: | True plus the employees count too |
| NAVIA: | Ok brother when you can send me the names or, we can give check guy the checks and send him the names like I did last time |
| NAVIA: | Whatever you think is best |
| AQEEL: | I just send you the name and list |
| AQEEL: | Start from list 1 and go all the way to list 5 |
| AQEEL: | Just keep the check between 3000 and 3500 |
| AQEEL: | Don't forget to put pay check for reference and today's date |
| NAVIA: | Ok |
| AQEEL: | Let [RM] aka check Guy, know |

    b.     On or about August 12, 2020, AQEEL and BAJWA texted about the company IB Floors, LLC ("IB Floors"), whose two PPP loan applications were cancelled and not

11

funded. BAJWA texted to AQEEL: "For IB FLOORS there is no F941. How many employees for W2 and which employee list to use?"

44. As part of the conspiracy, the defendants hid the true nature of the fraud by writing purported paychecks to fake employees. The fake employees listed on these paychecks included some of the defendants and some of their relatives. Many of these fake employees received checks from multiple companies.

    a. Person 8, an 86-year-old woman and the mother of AQEEL, received checks from at least six different companies that received fraudulent PPP loans, in addition to receiving unemployment benefits. In actuality, Person 8 was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

    b. NAVIA received checks from at least eight different companies that received fraudulent PPP loans, in addition to receiving a fraudulent PPP loan in the amount of approximately $455,916.65 for his own company, Grandeur Construction. In actuality, NAVIA was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

    c. Person 9 received checks from at least nine different companies. In actuality, Person 9 was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

    d. Person 10, a relative of AZEEMUDDIN, received checks from at least four different companies, including Grandeur Construction, which was owned by NAVIA. In actuality, Person 10 was not an employee of any of these companies and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.

    e. BASRA received checks from at least four entities that received fraudulent PPP loans in addition to receiving a fraudulent PPP loan in the amount of approximately $67,691 for her own company, Basra.   In actuality, BASRA was not an employee of the other four entities and did not receive any compensation from these entities prior to the companies receiving fraudulent PPP loans.   During the same period, BASRA also received unemployment benefits.

  45. As part of the conspiracy, the defendants laundered a portion of the fraudulently obtained PPP loan proceeds by cashing checks on behalf of fake employees.   The defendants often utilized Fascare International, Inc., doing business as Almeda Discount Store ("Almeda"), which was owned by AZEEMUDDIN.   During the course of the conspiracy, over 1,100 fake paychecks totaling over $3 million in fraudulent PPP loan proceeds were cashed at Almeda.   On occasion, the defendants communicated about the use of Almeda to hide the fraud.

    a. On or about May 13, 2020, AQEEL texted AZEEMUDDIN: "I will wash some checks through your company too."

    b. On or about June 22, 2020, AZEEMUDDIN texted AQEEL, "Also please send names for checks…9 names…will use below 9 names."   AQEEL responded with 9 names, which included BAJWA, MISAK, NAVIA, and REUTH.

  46. In total, the defendants submitted at least 80 fraudulent PPP loan applications to various lenders seeking nearly $30 million in PPP loan funds.   Ultimately, through the conspiracy, the defendants obtained approximately $16 million in fraudulent PPP loan funds, which they used for their personal benefit.   Because the PPP loan funds were guaranteed by the SBA, the defendants defrauded, among others, the SBA, Bank 1, Bank 2, Bank 3, Company 1, Company 2, and Company 3.

## COUNT 1

### Conspiracy to Commit Wire Fraud
### (18 U.S.C. § 1349)

47. Paragraphs 1 through 46 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

48. From in or around April 2020 through at least in or around October 2020 in the Southern District of Texas, and elsewhere, the defendants,

**AMIR AQEEL, SIDDIQ AZEEMUDDIN, RIFAT BAJWA, PARDEEP BASRA, MAYER MISAK, MAURICIO NAVIA, and RICHARD REUTH,**

did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to the Grand Jury, to commit certain offenses against the United States, namely: wire fraud, that is, to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and, for the purpose of executing such scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1349.

### PURPOSE OF THE CONSPIRACY

49. Paragraph 38 of the General Allegations section of this Indictment are re-alleged and incorporated as a description of the purpose of the conspiracy.

### MANNER AND MEANS OF THE CONSPIRACY

50. Paragraphs 39 through 46 of the General Allegations section of this Indictment are re-alleged and incorporated as a description of the manner and means of the conspiracy.

## COUNTS 2 THROUGH 10

### Wire Fraud
### (18 U.S.C. § 1343)

51.  Paragraphs 1 through 46 of the General Allegations section are re-alleged and incorporated by reference as though fully set forth herein.

52.  Beginning in or around May 2020, and continuing through in or around July 2020, in the Southern District of Texas and elsewhere, the defendants,

**AMIR AQEEL, SIDDIQ AZEEMUDDIN, RIFAT BAJWA, PARDEEP BASRA, MAYER MISAK, MAURICIO NAVIA, and RICHARD REUTH,**

knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and by omission of material facts, well knowing and having reason to know that said pretenses, representations, and promises were and would be false and fraudulent when made and caused to be made and that said omissions were and would be material.

53.  On or about the dates listed below, in the Southern District of Texas and elsewhere, the following defendants, for the purpose of executing and attempting to execute the aforementioned scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and omissions, did, with intent to defraud, cause the wire communications identified below to be transmitted by means of wire communication in interstate commerce.

| COUNT | DEFENDANT(S) | APPROX. DATE | INTERSTATE WIRE COMMUNICATION |
|---|---|---|---|
| 2 | AQEEL<br><br>BASRA | May 12, 2020 | The PPP loan application on behalf of Basra electronically submitted from Texas, and routed interstate through Company 1's servers outside of Texas. |

15

| COUNT | DEFENDANT(S) | APPROX. DATE | INTERSTATE WIRE COMMUNICATION |
|---|---|---|---|
| 3 | AQEEL  MISAK | June 1, 2020 | Wire transfer of $175,000 representing PPP loan disbursement from an account at Bank 1 to an account at Bank 6 in the Southern District of Texas. |
| 4 | AQEEL  BASRA | June 3, 2020 | Wire transfer of $565,082 representing PPP loan disbursement from an account at Bank 1 to an account at Bank 6 in the Southern District of Texas. |
| 5 | AQEEL  REUTH | June 5, 2020 | Wire transfer of $511,250 representing PPP loan disbursement from an account at Bank 1 to an account at Bank 5. |
| 6 | AQEEL  MISAK | June 8, 2020 | Wire transfer of $235,830 representing PPP loan disbursement from an account at Bank 1 to an account at Bank 4 in the Southern District of Texas. |
| 7 | AQEEL  BAJWA | June 22, 2020 | The PPP loan application on behalf of Kata electronically submitted from Texas, and routed interstate through Company 2's servers outside of Texas. |
| 8 | AQEEL  NAVIA | June 26, 2020 | The PPP loan application on behalf of Grandeur Construction electronically submitted from Texas, and routed interstate through Company 2's servers outside of Texas. |
| 9 | AQEEL  REUTH | July 15, 2020 | The submission of wire instructions in connection with a PPP loan application on behalf of Log and Sod Leasing via email to Bank 1. |
| 10 | AQEEL  AZEEMUDDIN | July 23, 2020 | A text message from AZEEMUDDIN to AQEEL's WhatsApp account with images of 32 fake employee paychecks. |

All in violation of Title 18, United States Code, Sections 1343 & 2.

## COUNT 11

### Money Laundering Conceal and Disguise
### (18 U.S.C. § 1956(a)(1)(B)(i))

54. Paragraphs 1 through 46 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

55. On or about August 14, 2020, in Houston, Texas, in the Southern District of Texas, and elsewhere, the defendant,

**SIDDIQ AZEEMUDDIN,**

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which financial transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, to wit: cashed a check in the amount of $1,913.22 from an account ending in 3306, held in the name of Jonathan's Farms, at Bank 2, made payable to Person 11 at Almeda through Bank 7.

All in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i).

## COUNTS 12 THROUGH 14

### Engaging in a Monetary Transaction with Criminally Derived Property
### (18 U.S.C. § 1957)

56. Paragraphs 1 through 46 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

57. On or about the dates set forth below, in Houston, Texas, in the Southern District of Texas, and elsewhere, the defendant,

**AMIR AQEEL,**

17

did knowingly engage and attempt to engage in the following monetary transactions, by, through, or to a financial institution affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, a transfer or withdrawal funds, such property being derived from a specified unlawful activity, that is, wire fraud in violation of 18 U.S.C. § 1343.

| COUNT | APPROX. DATE | FINANCIAL TRANSACTION | AMOUNT |
|---|---|---|---|
| 12 | May 15, 2020 | Wire transfer from account ending in 3818 at Bank 4, held in the name of "Aqeel Amir dba IRS Services," to a bank account at Bank 8 in Pakistan. | $50,000 |
| 13 | June 10, 2020 | Wire transfer from account ending in 3782 at Bank 4, held in the name of "Aqeel Amir dba Tax Star Ins & Financials," to a bank account at Bank 9 in Pakistan. | $50,000 |
| 14 | August 13, 2020 | Withdrawal from a checking account ending in 3645 at Bank 5, held in the name of "IRS Services" to purchase Official Check 425410 to Patten Title Company for the purchase of the Majestic Canyon Lane real property / AQEEL's residence. | $550,000 |

All in violation of Title 18, United States Code, Section 1957.

## NOTICE OF FORFEITURE

**(18 U.S.C. §§ 981(a)(1)(C) & 982(a)(1))**

58.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the United States gives notice that upon a defendant's conviction of a Section 1349 or 1343 offense as charged in this Indictment, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

59. Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice that upon a defendant's conviction of a money laundering offense as charged in this Indictment, the United States will seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

### Specific Property Subject to Forfeiture

60. The property subject to forfeiture includes, but is not limited to, the following:

   (a) real property on Majestic Canyon Lane in Houston, Texas, together with all improvements, buildings, structures and appurtenances, and legally described as follows:

   > Lot 2, in Block 1 of VINTAGE LAKES, SECTION TWO (2), PARTIAL REPLAT NO. 3, a Subdivision of Harris County, Texas according to the map or plat thereof, recorded at Film Code No. 630270 of the Map Records of Harris County, Texas.

   (b) 2013 Lamborghini Gallardo Spyder, VIN ZHWGU6BZ8DLA12803, purchased in or about June 2020 and registered and titled to Texas Star Ins & Financials, LLC, which is a business registered to AQEEL.

### Money Judgment and Substitute Property

61. The United States will seek the imposition of a money judgment against each defendant. In the event that a condition listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of each defendant in substitution up

to the amount of the money judgment against that defendant.

A TRUE BILL:

Original Signature on file

FOREPERSON

RYAN K. PATRICK
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF TEXAS

By: *Rodolfo Ramirez*
RODOLFO RAMIREZ
ASSISTANT UNITED STATES ATTORNEY

DANIEL S. KAHN
ACTING CHIEF
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE

By: *[signature]*
DELLA SENTILLES
LOUIS MANZO
TRIAL ATTORNEYS
FRAUD SECTION, CRIMINAL DIVISION
UNITED STATES DEPARTMENT OF JUSTICE